Good afternoon. May it please the Court, I'm Stanton Jones from Arnold & Porter and I represent BP. This is an extreme case where the claimant, a nationwide powerline contractor headquartered 150 miles from the Gulf, received a compensation award of more than $11.4 million despite being entitled to no award at all under the settlement agreement. The District Court abused its discretion by denying review of this massive windfall award for two reasons, and both of the issues in this appeal, the facilities allocation issue and the attestation requirement, both stem from the same fundamental problem, and that is, this claimant's purported losses have no basis in economic reality, and they certainly have nothing to do with this spill. Instead, this claimant used accounting gamesmanship to come up with a fictional loss in the compensation period after previously declaring a substantial gain in the same period. After several denials of its claim by the settlement program, the claimant submitted new P&Ls created for the fundamentally different company. I'll get into some of the specific numbers in those P&Ls, which are staggering, but essentially what happened is that in 2018, the claimant shifted a large amount of money from its right pocket to its left pocket, showed the claims administrator its newly empty right pocket. The left pocket was in the zone, right? The Gulf zone? So the... The other pocket was where? In Milwaukee? Yes, so essentially that's exactly right. So from a claimant's perspective, it's advantageous to have more revenue, to have better financials in 2009 and worse financials in 2010, because it's that delta. It's the decrease in revenue from 2009 to 2010 that drives up the compensation awards. And so what the claimant did here in its 2018 newly created P&Ls was for 2009, the new P&Ls allocate this enormous amount of money, tens of millions of dollars, from out of zone projects in Texas and Oklahoma to the claiming facilities in Mississippi. So it makes it look like the claiming facilities are doing well financially in 2009. My figures are $68,640,000 and change for end zone facilities in 2009. Yes, that's exactly right. The new P&Ls, so I'll just skip ahead and give you what I believe are the most important numbers. Under the original P&Ls, the consolidated company-wide P&Ls, to start with those, they reported 2009 revenues of $127 million and 2010 revenues of $122 million. It was just a modest 5% decrease, a revenue decrease of 4%. The newly created P&Ls from 2018 show 2009 revenues of $68.6 million and 2010 revenues of only $19.6 million. Instead of a modest $5 million decrease in revenue, the new P&Ls show a massive nearly $50 million decrease in revenue. And that was, I'm sure, repeatedly pointed out during the claims process to the claims administrator and then to the panel. So, Your Honor, importantly BP is not present at the claims administrator phase. That is between the claimant and the claims administrator. Don't you reply to the claim? So BP does not have any visibility into the claim until the claims administrator issues an award and then BP can appeal to the appeal panel. And you made that very clear, your position to the appeal panel. Yes. And the appeal panel erred in affirming the award and the district court erred in denying discretionary review. I will note that although BP is not present during the claims administrator phase, the claims administrator did acknowledge this extraordinary anomaly where all of a sudden, five years after having insisted that the corporate headquarters manages all of the work nationwide, all of a sudden in 2018 there's this massive drop in the revenues attributed to the corporate headquarters. It's in the calculation notes at page 2101 of the record. The calculation notes are the claims administrator's attempts to explain how the claim was calculated. And it specifically notes this extreme anomaly and says no further inquiry was made. No further requests or information were requested. And the only rationale that was provided was that the 2010 revenue, the bulk of the claimant's 2010 revenues came from two out-of-zone projects that were attributed on the new P&Ls to out-of-zone facilities. But that's no explanation at all because the same is true of 2009. In both 2009 and 2010, the majority of this company's revenue came from out-of-zone projects. In 2009, it was Texas and Oklahoma. In 2010, it was Colorado and Maine. And the accounting gamesmanship that was practiced here was that the 2018 newly created P&Ls assigned the 2009 out-of-zone revenue to the Mississippi headquarters and the new P&Ls assigned the similar out-of-zone revenues from 2010 to out-of-zone facilities, which makes it look like the headquarters is losing money. Just a couple of other figures which are striking. The original P&Ls showed a nearly 13% profit in 2010, whereas the newly created P&Ls report negative profit. They report that the company's headquarters, the headquarters of a substantially profitable company, was actually siphoning money in 2010. To say that it's implausible really understates it. It's hard to swallow. So if we're to agree with you and we were to write an opinion telling the district court, you should have reviewed the appeal panel because why? So I would point the court to our September 27th Rule 28J letter, which discussed two recent opinions of this court that have done essentially exactly what we would ask here. And in those two decisions, those are the foundation case and the basketball team case, this court vacated the district court's decision and remanded for either the district court or more likely the claims administrator to evaluate, to investigate a suspicious attestation by the claimant. Now, you say the basketball team. Do you mean the basketball player? No. There's a basketball player case, which is the David West case, which you're thinking of. And there's a separate case, a more recent case that involved the basketball team. I believe it was that player's team. In both of these recent cases discussed in our 28J letter, the foundation case and the basketball team case, this court specifically ordered on remand an assessment of the claimant's attestation under the standards that this court adopted in two other decisions earlier this year. Those are the David West case and the Howard Industries case. West and Howard established standards for implausible or suspicious claimant attestations. And importantly, in both the foundation case and the basketball team case, this court emphasized that when the district court had denied review, it did so without the benefit of this court's decisions in David West and Howard Industries. And all the same is true here. When the district court denied review here, it was before David West and Howard Industries. The district court did not have the benefit of this court's guidance on implausible and suspicious attestations. And for the reasons I've described, this claimant's attestation is deeply suspicious at best. The entire $11.4 million award, every penny of it, stems from the selective allocation of revenue to in-zone versus out-of-zone facilities in these new P&Ls that were created for the first time in 2018. Just so I understand, remanding on that basis is different from another argument you're making, which is whether these trailers and wherever they were are facilities under the meaning of the settlement agreement was incorrectly done. Exactly. That would be a separate ground, right? Correct. We've got some recent cases, I think, that counsel opposite filed a 28-J letter on those that seem to say, well, that's a factual determination. So the court in those other cases did conclude that it's a factual determination. This case, we believe, is different. The facts, the relevant facts here are not in dispute in terms of the claimant has construction trailers for job sites across the country, and there was no investigation by the settlement program into the nature of those construction trailers. Some of them are on site for jobs that bring in tens of millions of dollars per year. So there was certainly a basis to investigate. But yes, that facilities and allocation issue is independent of the attestation issue that I started with. And the settlement program independently misapplied the settlement agreement by failing to investigate the claimant's allocation of revenue. The identification of which business locations constitute facilities, that is the construction trailers issue. There should have been investigation of whether the trailers are separate facilities for purposes of Exhibit 5 and Policy 467. And then additionally, the settlement program should have investigated, even for the business locations that the claimant did count as separate facilities, the headquarters and the five other regional offices, the settlement program simply rubber-stamped the claimant's allocation, very suspicious allocation of revenues among them without conducting any relevant investigation whatsoever, even though under these circumstances, such an investigation was clearly warranted. Unless there are further questions, I'll reserve the balance of my time. Thank you. Thank you. May it please the Court. Good afternoon. Matthew McDade on behalf of the claimant and the appellee in this matter, Herbie Construction. Your Honors, what we have before the Court today is an appeal on factual determinations that were made. Don't say what we have. It's a failure to communicate. That would be a good movie quote. What we have is a dispute over factual determinations made by the claims administrator and an independent investigation performed by the appeal panel and a unanimous decision reached by that panel. What the Court needs to understand first and foremost is that BP is appealing the District Court's decision to deny a discretionary review. What is this? I understand that. Going back to the standard by which the District Court has, if you look at the rules that the District Court adopted by the standard by which Judge Barbier must determine whether or not he's going to grant discretionary review, the rules that were adopted by that Court and approved say that it's only for extraordinary and highly unusual situations. So that's the bar that BP has to meet. Well, you heard, sorry, Mr. Jones' pretty detailed explanation of why this is a really I've got the figures right here. I'm sure you do, too. So why is he wrong about that? Yes, Your Honor. Going back to the very beginning of this claim, this claim was filed in 2013. The claimant filed this claim as a single facility claim. It believed that its executive management team and that the nerve center for its company was in Richland, Mississippi, just south of Jackson. And it believed it was a single facility claim. At the time it filed that claim, Your Honor, it also presented a claim estimate prepared by professional accountants. And that claim estimate valued this claim at $14-something million. And it was filed with that consolidated P&Ls that Mr. Jones keeps referring to as only showing this $5 million difference between 9 and 10. Your Honor, if they were gamesmanship, why would they not have exercised that gamesmanship in 2013? They didn't game the program. What happened after that claim was filed is it proceeded through the claims process. And as I'm sure the court is aware, sometimes that process was painstakingly slow, as we sit here today six years later arguing over a claim that was filed in 2013. In 2017, the claims administrator, while investigating the claim, made the determination that this particular claim may be a multi-facility claim. This is the investigation that Mr. Jones says the claims administrator didn't do. In fact, the claims administrator did engage in that investigation, and they asked the claimant, okay, we've got your tax returns. What all is included in this? And Irby responded and provided the claims administrator with a list of its regional offices that are included in that. It had included the main headquarters in Jackson. It included a regional office, or excuse me, the main headquarters in Richland. It included a regional headquarters in Jackson, which mainly services energy. And it included four other regional offices that were outside the claim zone. And after that, they then asked Irby to provide an explanation, okay, what are these regional offices and what are these job site trailers? Tell us what these are. And they provided that explanation, Your Honor. And they provided it to the claims administrator. The claims administrator took that information and presumably laid it down against Policy 467 in Exhibit 5. The claims administrator made the decision that these four regional offices should not be included, as these were separate facilities. The claims administrator went back to Irby and said, we need you to remove revenues and expenses for these four regional offices. And that's what they did. So when BP tries to frame this as Irby went back and recreated its P&Ls, that's not exactly what happened. Irby went back and created the P&Ls that the claims administrator indicated they needed to recreate because of the fact that it had four facilities and its consolidated P&Ls that were not within the claim zone. But when you have a multi-facility business, isn't it true that you have to allocate revenues to end zone and out of zone facilities? That's correct, Your Honor. OK. So I'm looking at figures here for Irby that say these are the figures that the award is based on. 2009 pre-spill end zone facilities made $68 million. All other facilities, $58 million for a total of $127 million, right? That's correct, Your Honor. And then if we go, so that's pre-spill. Post-spill, 2010, we have end zone facilities with $19 million, a substantial drop. All other facilities, $102 million for a total of $122 million. So what is the explanation for the discrepancy between those two columns? Sure. I think first and foremost is BP's tried to cast this as all of the projects we did or the vast majority of the projects that Irby did were all outside the claim zone. And I think if you actually look through the record, Your Honor, you're going to see a different picture. And in fact, if you look at 2009, if you look what was required by the claims administrator was for Irby to provide the receipt detail ledgers for the actual payments that it received for specific jobs. And, Your Honor, that is in the record. Your Honor, I've lost the record sight in front of me, but that is in the record. It is a ledger of all the receipts from where these funds came from, the names of the customers. If you look at 2009, there are multiple receipts for Alabama Power Company, Cellular South, Intergy Services in Mississippi and in Louisiana. Not only was Irby managing jobs out of its home office and its Mississippi regional office, these were projects that were being performed in 2009 within the claim zone. 2010, when you look at that same ledger, those jobs aren't there. That work isn't there. And so it shows a loss within the claiming facilities, those two facilities being the Mississippi regional office and, more importantly, the corporate headquarters. Okay. So what about the uptick from $58 million to $102 million from 2009 to 2010? Sure, Your Honor. What's the explanation for that? Those were two particular projects that were managed by regional offices that started during that time frame. It was two large projects which were managed and overseen out of one of those outside regional offices. I think one of them was the Lower Colorado River Authority, which, as an aside, that particular customer had its own regional office. In other words, LCRA was a big enough customer of Irby that Irby went and put a regional office mainly to service that account or to service that particular customer. And so those two big projects made up the bulk of those out-of-zone revenues. And, Your Honor, that shows that there was a decrease in, regardless of whether there was an uptick in out-of-zone facility, quite frankly, the out-of-zone facility can be put aside. The question that is before the claims administrator is solely looking at the end-zone facilities and the year-to-year comparison of the two end-zone facilities. So when BP talks about the company-wide P&Ls from one year to the next, quite frankly, that's a red herring. Quite frankly, they want you to look at something that the claims administrator shouldn't have even considered. Now, were these things, these discrepancies or whatever they are, was this something that was investigated by the appeal panel? In other words, arguments made one way or the other, appeal panel renders the decision. Is that what happened? That's correct, Your Honor. In fact, these exact issues were briefed on a very smaller scale, just like they were briefed before this court. And the appeal panel noted in its unanimous decision that it did its own independent investigation. And, in fact, the appeal panel went as far as to say that it had the consolidated P&Ls, it had the separate P&Ls that did not include the out-of-zone facilities, and it had the relevant backup documentation so that it could lay those two down and make those comparisons. And that's in the appeal panel decision, Your Honor, a record, I believe, at page 243. Your Honor, all this dovetails back into the most important question before the court today, and that is whether or not the claims administrator misapplied the settlement agreement or, as this court has said, blatantly disregarded any particular provision of the settlement agreement. If you review the cases from this court, not only is it looking at a misapplication of the settlement agreement or a blatant disregard for any particular provision, it goes a step further and says, we need to look at whether or not this misapplication or this alleged blatant disregard has any effect on the future administration of the settlement. It looks at the bigger picture and really provides this court what those guideposts are is making sure that it's guiding the administration of the settlement. On that point, if you look at the record, Your Honor, if you look at the 2018, it's the July 2018 claims administrator's final report, if you look at how many claims are actually left to be processed, it's less than 1% of the 130,000 claims that were filed. So you're saying no judicial review from here on because there are too few claims left to be adjudicated? I'm saying— Why don't we summarily dismiss every BP case then? Your Honor, I'm saying on that second point, BP has to show how making this ruling is going to— or that this particular misapplication or this particular blatant disregard is going to affect the administration. And, Your Honor, we believe that that is a harder thing to prove when, quite frankly, at this point there's so very little left to actually administer on that settlement agreement. Your Honor, to BP's position that— How many $11.5 million claims are there left? Your Honor, I do not know that. How many million-dollar claims are there left? I do not know that, Your Honor. As those claims that are still in the facility, you're not allowed to—they're not publicly available, and so— It could be millions of dollars. We don't know the dollar amount. That could be, Your Honor. We don't know what percent of the total claims are still out there in terms of dollar amounts. We do not, Your Honor. We do not. But that goes to the issue that BP has to be able to show, number one, that those are, in fact, misapplications and or blatant disregard for the provision and that it does impact. Specifically, BP says the appeals panel, the district court, and the claims administrator didn't investigate enough. This court has thoroughly rejected that as being grounds for an abuse of discretion reversal. And, in fact, if you look at—I believe it's the Youngquist case that came out of this court June, I believe, of this year. It made it very clear that the failure to continue to investigate, even when more information might be available, that that alone was not grounds for an abuse of discretion review. That particular case, the Youngquist case, is a water and sewer line construction company, very similar to what Irby does. Irby is an electrical transmission line construction company. And, in fact, the same facilities question was at play in the Youngquist case as to whether or not the claims administrator and the appeal panel had done enough investigation to determine whether or not these on-site job trailers were, in fact, facilities. And that court, or this court, made the determination that that is a factual one-by-one case determination and it is not an abuse of discretion that involves the misapplication or involves the blatant disregard of an appeal panel decision. Your Honor, turning next to the attestation argument that's been raised by BP, first and foremost, causation was established in Exhibit 4B in the settlement agreement. That was an agreed-to, bargained provision that BP agreed to. Now, BP's tried every sense to get out of that, but that is what establishes causation. There's been a line of cases that discussed what is called the attestation issue, which boils down to causation. BP submitted in its supplemental authorities letter pointing to two cases that have come down since the West case. Discussing briefly the West case, the West case is about as extreme as it gets. You have a professional basketball player who contracted with his team to make more in 29 than he would make in 2010. There was a singular, sole, intervening cause for his losses in 2010, and it wasn't the oil spill. Two more reported opinions came out of this court the same week as the West case, and one of those was the Howard opinion that Mr. Jones referenced. If you look at what Howard was, Howard is a manufacturer of large electrical transmission equipment, and it was a $65 million claim. That equipment is sold across the nation. And even in light of that decision in West being a week before, the Howard case looked at it and came to the same conclusion that had been come to in all of the other cases, and that is the question before the district court and the question before the appeal panel is whether or not it was implausible that any of the claimant's losses were attributable to the oil spill. Not all of their losses. I don't think it's possible under the settlement agreement's calculation of damages to assure that all the losses, and in fact that Howard decision confirmed and even gave a hypothetical of when you would have alternative causes for the loss included with causes related to the oil spill. As I referenced earlier, Irby did substantial work within the states of Mississippi, Alabama, Louisiana, aside from managing multiple projects out of the state of Mississippi. And the record site I was looking for earlier, Your Honors, is pages 2047 through 2096. That is a detailed ledger of all the receipts received by Irby during the relevant time frame. The question before the court is whether or not it was implausible that BP's, or excuse me, that the claimant's losses were at part, even if in part, caused by the BP oil spill. There was another case that came out of this court, a reported case, at the same time as the Irby case, and that case is claimant ending in 1922. It's a March 28, 2019 reported opinion. That was relating to an Alabama industrial manufacturer who had about a $5 million claim. BP again raised the same arguments. Oh, they're 160 miles from the coast. How can they possibly attest to having a claim by the oil spill? Again, what this court went back to, the test for whether or not the attestation issue is at play, is whether or not it was implausible that any of their losses were caused by the oil spill. And that court, along with the Howard Court, affirmed the rulings of the district court's denial of discretionary review and upheld the awards given by the claims administrator. Your Honor, in summation, BP comes before this court arguing over fact issues. They claim the claims administrator didn't investigate the on-site trailers, didn't investigate the regional offices, and didn't investigate these revenue issues. The fact that this is a multi-facility claim rebuts that. It was the claims administrator who determined that this was a multi-facility claim, as it was originally filed, as a single-facility claim. So the fact that they investigated it to begin with shows that they did, in fact, perform an investigation. Not only did they perform an investigation as to what facilities were included in Irby's business, they then drilled down and said, okay, we need to know what your revenues and expenses were in these four non-claiming facilities. They made Irby submit two additional P&Ls and backup documentation, including that job cost detail report I referenced earlier. And they even, when they went to the appeal panel, the appeal panel referenced that and said not only do we have the P&Ls for the claiming facility, we have the combined P&Ls and the source documentation so that we can compare those two. This is ROA 243 where you would give me a site for the appeal panel? Correct. It's 243, Your Honor. That's correct. And as to the second issue, Your Honor, which follows the same abuse of discretion standard, BP has to show that there was a sole intervening cause that explains why Irby's losses were not caused by the oil spill. Much like in the West case, you had a sole intervening cause. It was his contract. Alternatively, they have to show that it was not plausible at all. And quite frankly, Your Honor, based on what's in the record, based on the work performed in Mississippi, in Alabama, and in Louisiana during that time frame, they simply have not met that under an abuse of discretion standard. For these reasons, we ask the court to affirm the district court's denial of discretionary review. Thank you. Thank you, Your Honors. You heard that this case involves factual issues. It does not. The relevant facts here are undisputed. It is undisputed that in 2018, five years after originally submitting its claim, the claimant created and submitted new P&Ls that turned the company's financial performance upside down. It is undisputed that this entire $11.4 million award results exclusively from assigning out-of-zone revenues to the Mississippi headquarters for 2009, but assigning similar out-of-zone revenues to other out-of-zone facilities for 2010. The explanation given by Mr. McDade was that in 2009, there were certain projects that were in-zone projects that were creating revenue, and then in 2010, those went away. In 2000, for all of the facilities, there were additional out-of-zone projects that caused the uptick and, well, uptick, the doubling of revenue from 2009 to 2010. I mean, is that accurate? If it's accurate, why doesn't it rebut what you're saying? So the history of this case and the numbers alone raise extraordinary suspicion about that. This claimant claimed for five years that it managed all of its projects nationwide exclusively from the Mississippi headquarters. It was only in response to inquiries from the settlement program that the claimant finally changed its position and said that it has these five other regional offices but no others. It gets even worse. Let me explain it this way. So in 2009, the new P&Ls allocate tens of millions of dollars in revenue from two projects in Texas and Oklahoma to the Mississippi headquarters, even though the claimant has a regional office in Texas.  They allocate tens of millions of dollars in revenue to out-of-zone regional offices for projects in Colorado and Maine, even though the claimant doesn't have any regional offices anywhere near Colorado or Maine. So in 2009, a company with a Texas headquarters is operating Texas and Oklahoma multimillion-dollar projects from Mississippi, and then the next year, regional offices in far-flung places are managing projects in Colorado and Maine. It doesn't add up. There are clear indicia of gamesmanship. The counsel references ROA 243, which is the appeal panel. It's an appeal panel comment in response to my question of, well, didn't the appeal panel just investigate this? So the appeal panel couldn't investigate. The appeal panel could look at the record, certainly, but the record showed that the claims administrator, the settlement program, did no investigation of its own, and you can see it clearly from the dates. From the time that the claimant submitted its new P&Ls until the award was issued was less than two months. The new P&Ls were submitted on March 9, 2018. That's a record on appeal 2040, and the award was issued in early May. That's a record on appeal 2101. There was no investigation conducted. What about the ledgers he keeps talking about? So the ledgers do not identify which facility should be assigned the revenue, and that's consistent, frankly, with what the claimant said for many years, which is that its corporate headquarters in Mississippi manages all the programs everywhere. It was only in 2010, I'm sorry, in 2018, that the claimant reversed course and developed this very selective, specific allocation of revenue from projects around the country in a way that maximized the claim but bears no connection to economic reality for this company. You heard that there aren't very many claims left, a suggestion that the court should throw up its hands and really not look at these anymore. This claim alone is worth $11.5 million. I think it merits attention. There are additional claims, but in any event, this is a class action settlement. This claimant is a class member, and there's certainly no rule that allows class members coming at the end of settlement administration to be treated differently than class members that came before it. We ask that the district court's decision be reversed. Thank you. Thank you. That will conclude the arguments before this panel, and the cases are under submission. Thank you.